IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2021 JUN 23 P 12: 42

CLERK
SO. DIST. OF GA.

| | | |
|---|---|---|
| SOHAIL M. ABDULLA; | ) | COMPLAINT |
| Plaintiff | ) | (JURY TRIAL DEMANDED) |
| | ) | Case No. |
| VS. | ) | |
| | ) | CV121- 099 |
| SOUTHERN BANK, AND SARDIS | ) | |
| BANKSHARES, INC. | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW, Pro Se Plaintiff Sohail M. Abdulla, and files this Complaint and alleges as follows:

## **PARTIES AND JURISDICTION**

1. Plaintiff Sohail M. Abdulla is a citizen and resident of South Carolina whose address is 647 Vincent Avenue NE, Aiken, South Carolina 29801.
2. Defendant Southern Bank is a Georgia corporation whose registered agent is Jamin Hujik and whose address is 731 Charles Perry Avenue P.O. Box 100, Sardis, Georgia 30456.
3. Defendant Sardis Bankshares, Inc. is a Georgia corporation whose registered agent is Jamin Hujik and whose address is 731 Charles Perry Avenue P.O. Box 100, Sardis, Georgia 30456

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Section 1332 (a)(1) because Plaintiff and Defendants are residents of different states creating diversity, and the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

Those who are supposed to be held to the highest standards and are deemed to be the most trusted are capable of the greatest destruction, particularly when they hide behind the veneer of righteousness and truthfulness. This is made even worse when they are dealing with those who are vulnerable. Hiding behind bombastic statements and simply expecting to be believed cannot prevail. Plaintiff understands that the allegations listed in this complaint may sound outlandish, but unfortunately they are true. The evidence provided speaks for itself. If the Defendants could refute these allegations, they would have given Plaintiff an accounting of what they did with the money. A plain reading of the evidence presented reveals why they will not give Plaintiff an accounting.

The law is well established that "pro se pleadings are generally held to a less stringent standard than pleadings drafted by attorneys, and thus should be liberally construed." Green v. Nelson, 595 F.3d 1245, 1254 n.4 (11th Cir. 2010). "[W]e read pro se briefs liberally to ensure that such litigants do not, through their ignorance of legal terminology, waive claims." United States v. Hung Thien Ly, 646 F.3d 1307, 1316 (11th Cir. 2011).

## FACTUAL BACKGROUND

### *The Sportsman's Link Bankruptcy and the Fraudulent Note*

5. Plaintiff executed a note and mortgage under seal with Defendants June 29, 2001. This was a one year note that **expired** on June 29, 2002. The loan number for this note was 412039900 [Hereafter "Original Goodale Note"]. **See Exhibit 1, Original Goodale Note** The security deed was recorded in Richmond County Georgia at Book 00738/2048 on July 12, 2001[hereafter "Goodale Security Deed"]. The Goodale Security Deed attached a condominium as collateral, hereinafter known as the "Goodale Property." **See Exhibit 2, Original Goodale Security Deed**

6. The debt for loan number 412039900 was paid by renewal in December of 2001and was paid in full on or before March 2005. No other legal mortgages were placed on the

Goodale Property after this time [**Exhibit 3, Abdulla Credit Report**] [**Pages 38 Line 3 through Page 39 Line 13 of Exhibit 7, Deposition of Ralph Dickey**]

7. In July 2006, Plaintiff executed a note and security agreement on behalf of his business, Sportsman's Link, Inc., in the amount of $850,213.00 [Hereafter "2006 Sportsman's Link Note" ]. [**Exhibit 4, 7/06/06 Sportsman's Link Note**] Included as security for this 2006 Sportsman's Link Note were all of the stock, merchandise and fixtures for Sportsman's Link, a $250,000.00 life insurance policy, certain other real estate parcels, a backhoe, 2003 Hummer, all furniture and fixtures located at 4020 Washington Road, and certain jewelry along with other collateral that was placed in the collateral vault of Defendants. The Goodale Property was listed in the designation of collateral in the 2006 Sportsman's Link Loan.  However, the only executed and recorded security interest in favor of Defendants was an assignment of rents found at Book/Page: 1197/1273 in Richmond County Georgia. [**Exhibit 5, Assignment of Rents**]  This Assignment of Rents did not allow Defendants to foreclose or obtain title to the Goodale Property.

8. No other security deed was **ever** executed or recorded for the Goodale Property after 2001. Loan 412039900 was satisfied in or before 2002.

9. As part of the 2006 Sportsman's Link Note, and specifically referenced therein, was a Third-Party Agreement that stated as follows:

> I [Sohail Abdulla] agree to give you [Southern Bank] a security interest in the property that is described on Page 1.  I agree to the terms of this note and security agreement **but I am in no way personally liable for the payment of the debt**.[Emphasis Added] **See Exhibit 4, 7/06/2006 Sportsman's Link Note**

This note was crafted by Defendants. The contra proferentem rule is a legal doctrine in contract law which states that any clause considered to be ambiguous should be interpreted against the interests of the party that created, introduced, or requested that a clause be included. The contra proferentem rule guides the legal interpretation of contracts.

10. Upon information and belief, this Third-Party Agreement was executed to allow Defendants to attempt to circumvent the lending limit restrictions prescribed by 12 U.S.C. Section 12, essentially doubling the amount the bank could legally lend to Plaintiff and his business.  Defendants would also be in violation of 12 U.S.C. Section 84 as well as 12 U.S.C. Section 93.

11. At the time of the loans, the lending limit for Defendants was approximately $1 million. [**Page 15 Line 17 through Page 16 Line 24 of Exhibit 7, Deposition of Ralph Dickey**]. At no time has the lending limit of Defendants exceeded $1.3 million as of March 15, 2018.

12. In March 2007, Sportsman's Link entered Chapter 11 Bankruptcy.

13. In Defendants' bankruptcy claim are numerous properties and collateral that Defendants fraudulently claimed they had a lien on, including "3.68 Acres" (deed recorded at Book 4105/174) [hereinafter the "Columbia County Parcels"]. The "3.68 Acres" tract had been fully paid off to Southern Bank, making the claim fraudulent.  The "3.68 acres" note was fully paid, just like the Original Goodale Note was fully paid.  Georgia Bank and Trust filed a bankruptcy Proof of Claim on this exact same property based an extant note they had.  Further, the backhoe, the 2003 Hummer, and all furniture fixtures and equipment located at 4020 Washington Road had been paid off and released by Defendants.

Defendants falsely inflated its collateral holdings, violating state and federal regulations. **See Exhibit 8 Georgia Bank & Trust Proof of Claim and Exhibit 6 Southern Bank's Original Bankruptcy Proof of Claim**].

14. In March 2007, Defendants filed a Proof of Claim with the Bankruptcy Court in the amount of $853,718.96 based on the 2006 Sportsman's Link Note. Also included in the Proof of Claim were the 2006 Sportsman's Link Note, and the 2001 Goodale Security Deed as supporting documentation. Included in these Notes are further fraudulent liens. [**Exhibit 6, Southern Bank's Original Bankruptcy Proof of Claim**]

15. On August 16, 2007, a motion to terminate Sportsman's Link's lease was filed by the landlord because counsel for Sportsman's Link had failed to timely file the acceptance of lease with the Court.

16. Upon information and belief, Counsel for Defendants, Mark Wilhelmi, advised his client that Sportsman's Link would not be able to reorganize in Chapter 11 and would be forced to convert to a Chapter 7 bankruptcy.

17. On or about August 30, 2007, fourteen days after a motion to terminate Sportsman's Link's lease was filed, the Defendants, required Plaintiff to travel to its office in Waynesboro, Georgia to execute additional documents on his commercial loan.

18. Plaintiff was required to execute another note to replace the 2006 Sportsman's Link Note. This other note [Hereafter "Renewal Note"] was in the amount of $843,640.46 which properly reflected the payments made on the 2006 Sportsman's Link Note since its original execution. The Renewal Note also included the same Third-Party Agreement attached to the 2006 Sportsman's Link Note. [**Exhibit 9, 8/30/2007 Renewal Note**]

19. Another document Plaintiff was required to execute on August 30, 2007 was a "Modification" of the Original Goodale Note under loan 412039900, secured by the Goodale Security Deed [hereinafter the "Fraudulent Note"].   [**Exhibit 10, Fraudulent Note**]

20. The Fraudulent Note purported to increase the loan amount from $200,872.00 to $843,455.46, but never modified the collateral pledged or the mortgage that was satisfied in 2005 or before. This Fraudulent Note purports to revive a **dead** note, which is legally impossible. Also, importantly, this Fraudulent Note does not have an account number. A dead note cannot be resurrected, as testified by Defendant's 30(b)6 witness Ralph Dickey. Also, how can the amount owed on the Original Goodale Note be exactly the same after six years? Plaintiff received no consideration from the Fraudulent Note.  This was done to illegally seize Plaintiff's property.  **See Exhibit 7 Page 17 lines 15-18 Deposition of Ralph Dickey**

21. Despite the purported increase of indebtedness from $200,872.00 to $843,455.46, no additional consideration was provided to Plaintiff.  This is clearly an additional and separate indebtedness since the amount of the Renewal Note is **$843,640.46** and the amount of the Fraudulent Note is **$843,455.46**  which is a **different** amount and a different Note.

22. Under Defendants' own regulations and federal law, the purported increase of over $642,583.46 in Plaintiff's indebtedness exceeded the lending limit of Defendants.  The total amount "lent" counting the fraudulent Renewal Note would be approximately **2.2 million** dollars; in violation of 12 U.S.C. Section 84. [**Page 48 Lines 15-22 of Exhibit 7, Deposition of Ralph Dickey**]

23. Defendants never obtained permission from the Bankruptcy Court to execute the August 2007 Renewal Note.  Further, the Renewal Note is not part of the bankruptcy record, in violation of bankruptcy law.

24. Defendants never disclosed the August 2007 Renewal Note or the Fraudulent Note to the Bankruptcy Court, nor did Defendants ever amend its claim to reflect the payments made by Plaintiff. Upon signing the Renewal Note, the 2006 Sportsman's Link Note became ***null and void*** leaving Defendants with no legal claim against Sportsman's Link in the bankruptcy proceeding nor against Plaintiff outside the bankruptcy proceeding in any way, shape, or form.  All of Defendants' actions in the bankruptcy proceeding were done in reliance upon the July 2006 Sportsman's Link Note which was ***null and void*** as of August 30, 2007.  This is a violation of 18 U.S.C. Sections 152 and 3571.  The fire sale of the Sportsman's Link inventory (in which the inventory was sold at vastly below market value) brought in around One Million Dollars.  Upon information and belief, Defendants absconded valuable articles out from under the sale.  Further, after a court order telling them not to sell Plaintiff's personal items in the auction, the Defendants violated and went ahead and sold them, defying the Court, and also have never given Plaintiff an accounting, credit, or listing for the wrongful sale of personal items sold at auction.  The Defendants continually exhibit a pattern of defying and lying to the various courts and not giving Plaintiff an accounting for monies Defendants wrongfully acquired.  **See Exhibit 11 Page 18 Line 20 through Page 19 Line 1, and Page 40 Line 14 through Page 41 Line 15, and Page 43 Lines 1-17.**

25. Upon information and belief, Defendants listed the Fraudulent Note as a valid account receivable in its general ledger despite the fact that it was a fraudulent note for which no consideration was given and violated the lending limits of the bank.

26. Sportsman's Link's lease was officially terminated and the bankruptcy converted to Chapter 7 in July 2008.

27. Defendants willfully and intentionally foreclosed on the Goodale Property in November 2008, using the Fraudulent Note, without providing lawful notice or serving Plaintiff with the necessary documents in violation of due process.

28. Defendants represented to the Court in the foreclosure that Plaintiff could not be located, despite Plaintiff's phone and e-mail contact with the President of Defendants, Ralph Dickey, as well as other employees of the bank during the same time period. Plaintiff has e-mails showing contact with Defendants and has testified under oath to being in contact with Defendants via phone and e-mail, as well as Plaintiff testifying that he was never notified by the Defendants that any foreclosures were imminent or occurring. To illustrate Plaintiff's concern, care, and trust of Mr. Ralph Dickey; in 2012, Plaintiff agreed to donate one of his own kidneys to Mr. Dickey, who was in need of one.  It also shows clearly Plaintiff's constant communication with Mr. Dickey since this was a long and arduous process over a period of years to be approved for the kidney transplant. The form attached is a referral form initiated by Mr. Dickey. The moral contrast between the Plaintiff and the theft and prevarication of Defendants is stark.   **See Exhibit 11Abdulla Depostion Page 15 Line 1 through Page 17 Line 10  and Exhibit 12 E-mails to Ralph Dickey and Exhibit 22 Emory Transplant Center Kidney Living Donor Program Evaluation Referral Form**

29. On November 4, 2008, Defendants finalized the foreclosure by filing a deed under power transferring title to Defendants.  The foreclosure was based on Original Goodale Note (which clearly expired on June 29, 2002) in the amount of $200,872.00 and the Goodale Security Deed recorded at 00738/2048 that was paid off and **dead**. Defendants bid in $125,000 at the foreclosure sale.  This is another lie to another court.  The note was **dead** and **nothing** was owed on this property.  And most tellingly of all, Defendants never made any charge-offs or sued Plaintiff for any deficiency whatsoever for any loans attached to the Goodale Property, because *there was no extant note*.  [**Exhibit 13, Foreclosure Filing on Goodale Property**]

30. At the foreclosure sale, the bank made a bid of $125,000.00 and took "legal" title to the Goodale Property.  This acquisition was never reported to the bankruptcy court even though the Goodale Property was specifically listed in the 2006 Sportsman's Link Note, the (invalid and void) 2007 Renewal Note, and the Proof of Claim as collateral for the debt owed to Defendants by the debtor in bankruptcy.  The $125, 000 simply disappeared and has never been accounted for despite repeated requests by Plaintiff and assurances under oath by Defendants that they would provide it. Since Plaintiff didn't receive it, who got the money?

31. In September 2009, Defendants resold the Goodale Property to Janice Clark for $185,000.00 (which was financed by Defendants *with a less than 1% down payment*).  This profit of $60,000.00 was never reported to the bankruptcy court despite the fact that the Goodale Property was specifically listed in the 2006 Sportsman's Link Note, the unlawful 2007 Renewal Note, and the Proof of Claim as collateral for the debt owed to Defendants by the debtor in bankruptcy.   In 2011, Defendants filed an Amended Proof of Claim with

the bankruptcy court.  This claim failed to report the **$10,000.00** in direct payments made by Plaintiff on the 2006 Sportsman's Link Note and reflected the amount in the Renewal Note.  This is the same note that the Defendants never disclosed to the Bankruptcy Court, nor did Defendants ever amend its claim to reflect the payments made by neither Plaintiff nor the acquisition of the Goodale Property by Defendants, or the subsequent sale of the Goodale Property to Janice Clark and financed by the Defendants for the buyer.  This is a violation of 18 U.S.C. Sections 152 and 3571.   Upon information and belief, Plaintiff believes that this was a "straw man sale" to Ms. Clark.  The Defendants bought the Goodale Property again for $173,700.00 it being the highest bidder. [**Exhibit 14, Southern Bank's Amended Bankruptcy Proof of Claim** ]

### Other Illegal Foreclosures and Seizure of Property

32. Plaintiff had two personal debt obligations to Defendants in 2008.

33. The first was a debt of $110,366.72 which was originally secured by three motor vehicles.

34. On July 22, 2008, a hearing was held in which the Plaintiff did not attend because of his doctor's orders and the Court was notified and the Defendants was aware of this fact, Defendants required Plaintiff to sign another note on July 25, 2008 for the $110,366.72 debt [Hereafter "$110,366.72 Note"] only three days after the July 22, 2008 Court hearing where the doctor's order clearly stated that he would reevaluate the plaintiff in thirty days.

35. This $110,366.72 Note added a 7.68 acre real estate parcel in Burke County Georgia and an additional 1.19 acre parcel in Columbia County Georgia as collateral to the debt.  No additional consideration was given for this $110,366.72 Note.  Plaintiff was sick at the time of signing this note and was not of sufficient capacity to sign this foolish and unnecessary note ceding over to Defendants around $250,000.00 of additional unneeded collateral.

Defendants' 30(b)6 witness Ralph Dickey admitted to Plaintiff's lack of capacity and knew that Plaintiff left the country because of his health, because he knew firsthand and was told by Plaintiff, making this additional collateral null and void by law. Plaintiff was sick at the time of signing the $110,366.72 Note and was not of sufficient capacity. Further, Defendants did not provide lawful notice nor did they serve Plaintiff with the necessary documents which violated due process. **See Exhibit 7 Page 25 Lines 2-20 Deposition of Ralph Dickey and Exhibit 11 Abdulla Deposition Page 15 Line 23 through Page 16 Line 21**

36. Defendants moved to repossess the vehicles and foreclose on the added real estate in less than **42** days after the signing of the $110,366.72 Note, which was months before the note was due. Defendants repossessed **four** cars and not **three** according to Defendants' letter. **Exhibit 15 9/05/2008 Letter of Mark Wilhelmi** [There was a 2004 Ford Mustang GT Convertible Mystichrome that was not stated in the letter (Extreme Custom Built, Super Charged, Upgraded Engine, Show Car. Last Year It Was Built) 13,008 Miles VIN #1FAFP45X84F204928. Defendants also repossessed a 2000 Ford Mustang hardtop black Custom Built, Super Charged Race car, that Defendants had no lien on but was stated as repossessed in the letter] The repossession and default notices were sent to an address where Defendants knew that Plaintiff was not located at. The letter itself states Defendants knew that the Plaintiff was out of the country and not at the address to which the letter was sent. Further, the vehicles were repossessed before even sending the letter. No record whatsoever has been provided to Plaintiff with regards to the disposition of these vehicles or any monies obtained there from. Since Plaintiff didn't receive the money, who got the money? Plaintiff never was given an opportunity or notice whereby he could correct **any**

defaults and they stated it would be too late before Plaintiff found out, despite the fact that Plaintiff was in continuous contact with Defendants' president Ralph Dickey as well as other bank employees. Ralph Dickey advised Plaintiff that he had well over One Million Dollars in equity in the Columbia County land and improvements, and Defendants said "let's get it appraised". The Defendants had its own appraisal done which came to around Two Million Dollars. Ralph Dickey had a family member of Plaintiff pre-approved for over One Million Dollar loan from Defendants itself for the Columbia County properties. Plaintiff had well over One Million Dollars in equity in the Columbia County land and improvements alone, according to the Defendants' own appraisal. Plaintiff's family member was pre-approved for at least a One Million Dollar loan from Defendants itself for the Columbia County properties. The property was presold and loan preapproved, if needed according to Ralph Dickey, with all debts being paid off; without the destruction caused by Defendants. There was absolutely no reason for Defendants to intentionally and maliciously foreclose on Plaintiff's properties, except to illegally make an exorbitant profit. **See Exhibit 15 9/05/2008 Letter of Mark Wilhelmi and Page 15 Line 23 through Page 16 Line 21 and Page 23 Line 22 through 24 Line 2 Exhibit 7 Deposition of Ralph Dickey and Page 20 Line 12 through Page 21 Line 1 Exhibit 11 Abdulla Deposition**

37. The second personal debt was $363,388 which was secured by two Columbia County Parcels. One of these parcels (a 31 acre tract in Columbia County) was listed in the bankruptcy Proof of Claim, purportedly to secure the 2006 Sportsman's Link Note and the Renewal Note - which was not recorded in the bankruptcy proceeding or any other court, making it invalid. This is a violation of 18 U.S.C. Sections 152 and 3571.

38. In October and November of 2008, Defendants instituted foreclosure proceedings against Plaintiff on the Columbia County parcels and a real estate parcel in Burke County Georgia.

39. Plaintiff did not receive any notice of the foreclosures and Defendants made no legitimate effort to inform Plaintiff of the foreclosures as required by the fundamentals of due process, even though Defendants was in full contact with Plaintiff.  In fact, Defendants intentionally moved to seize all of the properties while Plaintiff was away, and intentionally made no real effort to give him notice.  Legal notice was not given, and all of the seizures by Defendants are illegal and invalid by law.

40. Defendants bid $350,000.00 on the Columbia County Parcels and took title thereto. In October of 2008 the Defendants foreclosed on these two parcels (31 Acres and 22 Acres for the $350,000 figure). Also in October of 2008 the Defendants had its own appraisal done for these exact properties. The 53 Acres appraised for $583,000 and the Defendants bought it back at 40% below its own appraised value; at $233,000 below appraised value. The Defendants stated that it will show that $350,000 was the <u>fair market value</u> in their application to confirm the foreclosure sale.  Once again showing the Defendants' pattern of lying to courts and profiting from it.  This is clearly Unjust Enrichment on the part of the Defendants.  [In December of 2008 the Defendants "charged off" **$363,388.00** which was the entire amount for this note. Where did this money go? One Hundred Percent of the loan amount for this note was written off by the Defendants and no credit was given to the Plaintiff.] <u>Exhibit A Plaintiff's Credit Report showing write offs</u>

41. Defendants bid $30,000.00 on the Burke County Parcel and took title thereto   On January 4, 2007, Plaintiff paid $170, 00.00 for this very same property.

42. Defendants bid $40,000.00 on the 1.19 Acres Columbia County Parcel and took title thereto (this property once again was sold and financed by Defendants for the buyer). Further, Defendants sold Plaintiff's modular log cabin without having title to it or having a lien on it and without giving Plaintiff credit for the sale. Where did the money go?

43. The three vehicles securing the $110,366.72 debt obligation were repossessed and sold to individuals in October 2008. Defendants failed to liquidate the personal property of Plaintiff through a commercially reasonable collateral sale as required by law. Defendants bid in $30,000.00 on the Burke County Parcel. Plus, Defendants bid in $40,000.00 on the 1.19 Acres Columbia County Parcel. Plus, Defendants itself claimed it "charged off" $35,253 on this note alone. Defendants' total gain was $105,253. Plus, they received the extra profit of $47,500 for the sale of the Burke County Parcel. Where did the money go for the automobiles? Also, this is breach of contract of a document under seal, since Plaintiff did not receive credit for property seized. The amounts received for these vehicles have never been provided by Defendants (despite numerous requests) nor have those amounts been credited to Plaintiff in any way. **See Exhibit 7 Page 53 Lines 12-25, Page 57 Line 15 through Page 64 Deposition of Ralph Dickey Also Exhibit A Plaintiff's Credit Report showing write offs**

44. Plaintiff did not receive any notice of the repossessions or sales and Defendants made no legitimate effort to inform Plaintiff of the foreclosures as required by the fundamentals of due process. In fact, Defendants intentionally moved to seize all of the properties while Plaintiff was away, and intentionally made no real effort to give him notice. Legal notice was not given, and all of the seizures by Defendants are illegal and invalid by law.

45. The Columbia County parcels were subsequently sold for $490,000.00 by Defendants and financed by the Defendants for the buyer.  Defendants "charged off" **$363,388.00** which was 100% of Loan #413623700 that secured the Columbia County parcels, This fraudulent charge off by the Defendants created a false tax liability for the Plaintiff.  The Defendants are double dipping on everybody.  This is despite Defendants putting in a successful bid of **$350,000** for these parcels and subsequently selling them for **$490,000**.  *This one sale* *alone* overpaid Plaintiff's *entire* debt to the Defendants.  How can you write off something and gain substantial profit on the same thing at the same time?  The Defendants did not give Plaintiff credit for the sale.  **Exhibit B Sales History and Exhibit A Plaintiff's** **Credit Report showing write offs**

46. The Burke County Georgia Property was subsequently sold for $77,500.00 by Defendants. Further, the Defendants financed this sale for the buyer, lending him $118,470.00 for this property.  Defendants lent $40,970.00 over and above the sales price of $77,500, after illegally taking the property for $30,000. **Exhibit C Sales History**

47. Despite ultimately recovering more than $567,500.00 [Plus the Defendants "charged off" $398,640.00 totaling $966,140.00.  Defendants profited **$505,773.28**  (This amount does not include the sale of the Goodale Property, the four automobiles, Plaintiff's personal items wrongfully sold in the auction, the contents in the properties, the missing contents of the safety deposit box, and the modular log cabin) for a debt of only $460,366.72, Plus Defendants reported deficiencies equaling **$398,640.00** on Plaintiff's credit report. Defendants itself claimed it "charged off" in excess of **$363,388**.  Defendants *profited* $505,773.28.  Of particular note, the Defendants itself financed every single one of their sales of these properties for the respective buyers, thereby keeping close control of these

transactions.  A bank's accounts must balance.  If Defendants wrote it off and Plaintiff

didn't get the money, then who did?  **See Exhibit 16 2/24/2016 Letter From Mark**

**Wilhelmi last paragraph titled Charge Off  and Exhibit A Plaintiff's Credit Report**

**showing write offs**

### Dendant's Fraudulent Acts to Conceal Illegal Activity

48. In 2010, Plaintiff continually requested from Defendants all documents related to his
property including loans, bank accounts, and personal guarantees from.  Defendants did
provide some bank statements, but nothing pertaining to the Fraudulent Note, any
repossession or sales, accounting, or any foreclosures was provided.

49. In 2016, Plaintiff again requested all documents related to his property, loans, bank
accounts, and personal guarantees from Defendants.  Nothing was provided as Defendants
claimed that all information was available online through the bankruptcy file on the Pacer
Website.  This was false, since nothing pertaining to any personal obligation of Plaintiff,
any repossession or sales, accounting, or any foreclosures nor anything about the
Fraudulent Note, was on file with the bankruptcy court. To date, none of this information
has been provided to the Plaintiff by the Defendants even after numerous requests since
2010 and assurances under oath by Defendants that they would provide it on March 15,
2018. Further, in a separate action, Defendants' 30(b)6 witness Ralph Dickey swore, after
attaching many documents that were up to twenty five years old, that "These attachments
only represent a small portion of the files held by Southern Bank involving Mr. Abdulla
and Sportsman's Link, which are also available for inspection" And yet they refuse to
produce the documentation requested by Plaintiff and to which he has a right to have by
law.  Plaintiff made requests for his documents on numerous occasions.  And not only did

Defendants not provide the documents, the Defendants made clear statements to Plaintiff so as to dissuade Plaintiff from investigating.  And continue to do so to this day. Counsel for Defendants even admitted is was not unreasonable for Plaintiff to want an accounting for his monies. *Any claim of Defendants that the statute of limitations has run is barred by equitable tolling.* **See Exhibit 21 Paragraph 9 of Affidavit of Ralph Dickey and Exhibit 11 Page 13 Line 7 through Page 15 Line 9, and Page 57 Lines 6 through 21 Abdulla Deposition See Also Exhibit D 11/02/2016  Letter of Mark Wilhelmi**

50. In 2016, counsel for Defendants, Mark Wilhelmi, made numerous false assertions that concerned Plaintiff:

    a.  The Renewal Note in 2007 was done through an informal and unreported agreement with counsel for Plaintiff, with no attempt to ever notify (or get the approval of) the bankruptcy court or any other creditor;

    b.  The Fraudulent Note was executed to cover the debt obligations of Sportsman's Link and Plaintiff's personal obligation arising there from when there was absolutely no documentation to support this assertion;

    c.  The proceeds from the sale of the Goodale Property were applied to the Sportsman's Link Debt, but were never reported to the bankruptcy court or reflected in the Amended Proof of Claim filed 2 years after its resale by Defendants; along with no credit given to Plaintiff and

    d. No attempt was made to locate Plaintiff with regard to the foreclosures or repossessions because Plaintiff had "fled the country" which was patently false and a slanderous lie. Plaintiff left with a two way ticket while in constant communication with Defendants including Plaintiff giving Defendants Plaintiff's contact information

17

and notifying Defendants **before** Plaintiff left. Plaintiff was in the process of returning

when continuously advised by his own counsel Mr. Bill Williams to stay where he was

at. He stated "Stay where you are until we can figure out what else is going on".

Further, Plaintiff was asked by the Defendants to help them in a lawsuit brought

against them in 2009, to which Plaintiff complied and gave them assistance and was in

complete communication with them.   **See Exhibit 16 2/24/2016 Letter From Mark**

**Wilhelmi See also Exhibit 12 Emails to Ralph Dickey.  See also Exhibit 17**

**Plaintiff's Affidavit  See Also Exhibit 18 Two Way Plane Ticket  See Also Exhibit**

**19 E-mail Communication From Bill Williams Bullet Point 7. Also Exhibit 11**

**Page 52 Lines 6-12 Abdulla Deposition**

51. In response to a separate lawsuit brought by Plaintiff in 2017, Defendants falsely asserted

in pleadings to the Aiken County Court of Common Pleas that:

a.  the Sportsman's Link notes were "personally guaranteed" by Plaintiff, despite the

fact that the aforementioned "Third-Party Agreement" specifically prevented any

deficiency against Plaintiff; Further, Defendants never sought  any deficiency

judgment from the Plaintiff based on this document, since the Plaintiff  was not

personally liable.  [**Paragraph 5 of Exhibit 20 Third Party Agreement, Answer in**

**2017-CP-02-00283**]

b.  the Amended Bankruptcy Proof of Claim was filed because of the August 2007

Renewal Note, despite the fact that the August 2007 Renewal Note was never

disclosed to the Bankruptcy Court and the actual debt refinanced in the 2007

Renewal Note was never reported, thereby allowing a fraudulently inflated

indebtedness to remain on record (After being caught, Plaintiff later admitted this was not true); [**Paragraph 8 of Exhibit 20, Answer in 2017-CP-02-00283**]

c.   Defendants suffered a loss in excess of $363,000.00 loss due to the loans given to Plaintiff and his business;  [**Paragraph 10 of Exhibit 20, Answer in 2017-CP-02-00283**]

52. In a motion to dismiss in the aforementioned action, Defendants' 30(b)6 witness submitted an affidavit [**Exhibit 21, Affidavit of Ralph Dickey**] that made several perjured assertions:

a.   That Defendants suffered an "actual loss" in excess of **$363,000.00** as a result of the Sportsman's Link debt;   See Exhibit 21 Paragraph 7 Affidavit of Ralph Dickey

b.   That Plaintiff was personally liable for the "actual loss" in excess of **$363,000.00**. See Exhibit 21 Paragraph 7 Affidavit of Ralph Dickey

53. In 2018, Plaintiff was able to depose a representative of Defendants through another proceeding pursuant to Rule 30(b)(6), SCRCP.  During that deposition, numerous perjured statements were made by Defendants and Mr. Wilhelmi:

a.   Mr. Wilhelmi again declared that the Fraudulent Note was executed to cover the Sportsman's Link debt in bankruptcy;  [**Page 4 of Exhibit 7, Deposition of Ralph Dickey**]

b.   Mr. Wilhelmi declared that Sportsman's Link was given credit for the  $125,000.00 value of the Goodale Property and that credit was reflected in the Amended Proof of Claim;  [**Page 42 Line 18 through Page 43 Line 4 of Exhibit 7, Deposition of Ralph Dickey**]

   c.   Defendants and Mr. Wilhelmi declared that Plaintiff personally owed more than **$363,000.00** to Defendants;  **[See Page 44 Line 5 through 15 of Exhibit 7, Deposition of Ralph Dickey]**

   d.   Defendants claimed that they were going to locate another note justifying the claimed deficiency and the Fraudulent Note (the deposition was stopped because Defendants' 30(b)6 witness could not explain many of the discrepancies placed before him);  **[See Page 61 Lines 8 through 25 Exhibit 7, Deposition of Ralph Dickey**

   e.   Defendants claimed that they were never in contact with or knew where Plaintiff was when he left See **Page 15 Line 23 through Page 16 Line 21 Exhibit 7 Deposition of Ralph Dickey**

54. Defendants stated on the record in the deposition, which occurred on March 15, 2018, that the additional documentation justifying the deficiencies, sale of the automobiles and the Fraudulent Note would be researched and produced to Plaintiff (thereby acknowledging and admitting that it had not provided documentation to Plaintiff and had theretofore hidden it).  As of the time of this filing, nothing has been produced to justify the deficiencies, sale of the automobiles and the Fraudulent Note, nor has any accounting been given to Plaintiff, nor has any rational answer been given.

55. On February 2, 2018, Defendants willfully and intentionally put Plaintiff's personal information on the public record in the Aiken County Court of Common Pleas while failing to properly redact it, violating not only the court's own rules but also the Gramm-Leach-Bliley Act and the Privacy Act of 1974.  These include social security number, driver's license number, date of birth, and personal history, etc.  They put all this out for the world

to see anything and everything you would expect to see in a personal financial statement. Anyone could steal Plaintiff's identity at any time, causing damage to Plaintiff in perpetuity as there is no putting the milk back in the bottle. This is a gross and uncaring action made by the Defendants, and is another act in an ongoing pattern of disdain for Plaintiff's rights.  Plaintiff told Defendants on September 17, 2018, as soon as Plaintiff found out to remove these documents from the public record; and Defendants willfully left the other personal financial statement filed on February 2, 2018 and willfully and defiantly relisted Plaintiff personal financial statement back up again in a separate proceeding on April 5, 2019 without failing to properly redact it.  Plaintiff will provide this evidence to the court in a sealed manner at the court's discretion; **See Exhibit 23 9/17/2018 Player Letter to Wilhelmi**

### FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

56. The preceding paragraphs are incorporated herein as if restated verbatim.

57. Defendants foreclosed on an invalid/dead note and the Goodale Security Deed in 2008 as both had been satisfied in or before 2005.

58. All of the instruments which Defendants violated and breached are under seal, thereby making the statute of limitations 20 years from the right of accrual; pursuant to Georgia law and any claim of Defendants that the statute of limitations has run is barred by equitable tolling.   These include, but are not limited to, the Goodale Modification, the Goodale Security Deed, the Original Goodale Note, the $110,366.72 Note, the $110,366.72 Security Deed, the $363,388.00 Note, the $363,388.00 Security Deed, and the 2006 and the 2007 Sportsman's Link notes.

59. Further, the fraudulent acts of Defendants concealed the particulars of their wrongdoing until 2018, and are continuing to conceal their wrongdoing up to the time of filing.

60. As Defendants wrongfully foreclosed on the Goodale Property by using an invalid note and mortgage that were previously satisfied, that foreclosure was void *ab initio*.

61. Plaintiff suffered damages and continues to suffer damages as a result of Defendants' wrongful conduct in an amount to be determined by a jury.

<u>FOR A SECOND CAUSE OF ACTION</u>
<u>(Accounting)</u>

62. The preceding paragraphs are incorporated herein as if restated verbatim.

63. Defendants failed to provide any notice or accounting of the seizure and ultimate sale for Plaintiff's personal property taken in 2008 to date.

64. Defendants failed to provide any notice or accounting of the foreclosures and ultimate Deeds under power for Plaintiff's real property taken in 2008, or what happened to the content in the property to date.

65. Defendants failed to liquidate the personal property of Plaintiff through a commercially reasonable collateral sale as required by law.

66. Defendants failed to apply the proceeds of the collateral sale to the outstanding indebtedness of Plaintiff.

67. Plaintiff is entitled to all documents, notes, and a full accounting of the sale of his collateral in 2008 and beyond.

68. Plaintiff suffered damages and continues to suffer damages as a result of Defendants' wrongful conduct in an amount to be determined by a jury.

<u>FOR A THIRD CAUSE OF ACTION</u>

22

**Violation of the Federal Trade Commission Act**

69. The preceding paragraphs are incorporated herein as if restated verbatim.

70. Plaintiff and Defendants are "persons" within the meaning of Federal Trade Commission Act (hereafter "FTCA").

71. Defendants were engaged in commerce within the meaning of the FTCA.

72. Defendants' actions described hereinabove constitute unfair and deceptive practices within the meaning of FTCA. Also, with the litany of **facts** presented regarding Defendants' deceptions and actions, it appears more than likely that Defendants has violated its own bank charter.

73. Defendants' acts are capable of repetition, and, upon information and belief, have been repeated.

74. Defendants knew or reasonably should have known their conduct violated the FTCA.

75. As a direct, foreseeable, and proximate result of Defendants' unfair and deceptive practices, Plaintiff suffered and continues to suffer actual, consequential, and incidental damages as a result of these losses and actions.

76. Plaintiff is entitled to recover their actual damages, which amount should be trebled, together with interest.

77. Defendants have already had its chance to tell the truth in multiple courts and have shown an ongoing pattern of *deceit*. Defendants have made false representations to and perjured itself in the Richmond County Georgia Superior Court, the United States Bankruptcy Court for the Southern District of Georgia, Aiken County South Carolina Court of Common Pleas, and the South Carolina Court of Appeals. Further, the Defendants are a financial institution and are held to a higher standard with regards to honesty and public trust than an ordinary layman is. Defendants should not be allowed to profit from their illegal activities

23

and the Doctrine of *Unclean Hands* applies with regards to the Defendants. It should also be noted that although attorneys are allowed to give a vigorous defense of their client, they cannot knowingly lie to the Court on behalf of their client.  This honorable Court should disregard any testimony of Defendants or any defense of Defendants brought before this Honorable Court.

78. Plaintiff suffered damages and continues to suffer damages as a result of Defendants' wrongful conduct in an amount to be determined by a jury.

### For a Fourth Cause of Action

### Violation of the Gramm-Leach-Bliley Act and the Act and the Privacy Act of 1974

75. Defendants maliciously and intentionally Plaintiff's personal information out to the public in its filing on February 2, 2018.  Important personal and confidential information was put in the public record; able to be viewed by anyone.  Little to no effort was expended by Defendants to redact or ensure concealment of this personal information. This is a clear violation of what the Gramm-Leach-Bliley Act and the Privacy Act of 1974 was created to prevent actions like these. Defendants have taken no action whatsoever to redact the Plaintiff's Personal Financial Statement to date, and has caused tremendous harm to Plaintiff.  Defendants were warned by Plaintiff's counsel on 9/17/2018 regarding this matter and Defendants ignored him.  Defendants even had the gall to republish the Plaintiff's Personal Financial Statement in a subsequent proceeding on April 5, 2019 showing clear intent and a callous disregard for Plaintiff on Defendants' part.  The damage goes on in perpetuity for Plaintiff.  **See Exhibit 22 Player letter to Wilhelmi 9/17/2018 and Exhibit 7 Page 16 Line 25 through Page 17 Line 8**

76. Plaintiff suffered damages and continues to suffer damages as a result of Defendants' wrongful conduct in an amount to be determined by a jury.

### For a Fifth Cause of Action

### Illegal Entry of Safety Deposit Box

77. Defendants willfully and illegally drilled and entered Plaintiff's safety deposit box at the direction of their counsel, Mark Wilhelmi in 2017 while in litigation.  Mark Wilhelmi stated "Southern Bank informed me that Mr. Abdulla also had a safety deposit box with the bank which has not been paid and was in default.  **At my recommendation, Southern Box had the safety deposit drilled open.  Upon opening the safety deposit box, they discovered that the inner box was missing entirely**.  In addition, the **Signature Card for the lock box cannot be located**.  Southern Bank has no idea what the original contents of the Safety deposit box were." This box account was apparently kept open despite ten years of nonpayment.  It is beyond suspicious for anyone to believe Defendants' statement that **"the inner box was missing entirely"** (Implying that Plaintiff could simply walk out of the bank with this box, which was the largest box that the bank offered) and in addition, "the **Signature Card for the lock box cannot be located"** Plaintiff was in continuous contact with Ralph Dickey from 2008 to 2018.  Suspiciously, the "Signature Card could not be located", according to the Defendants.  Most blatant of all is the fact that this box was opened during the pendency of a court case in which the contents of the box were at issue; Plaintiff's counsel was never notified of the proposed drilling of the safety deposit box.  This was exactly what the Defendants did when Plaintiff was out of the country for his health.  Despite the fact that the Plaintiff was in full and continuous contact with the Defendants in this case, no notice was given and

Defendants did as they pleased, with no regard to the law or to Plaintiff.  Plaintiff would like to know what happened to the contents of the box.  **See Exhibit 7 Deposition of Ralph Dickey Page 17 Line 19 through Page 21 Line 19 and Exhibit 24 8/3/2017 Wilhelmi Letter to Player and Exhibit 11 Abdulla Deposition Page 47 Line 6 through Page 52 Line 12.**

78. Plaintiff suffered damages and continues to suffer damages as a result of Defendants' wrongful conduct in an amount to be determined by a jury.

## For a Sixth Cause of Action

## Violation of the Fair Credit Reporting Act

79.     Defendants willfully and intentionally placed multiple false write offs on Plaintiff's credit report totaling **$398,640.00**.  Defendants knew that these were false reports of losses that were applied to Plaintiff.

80.     Plaintiff suffered damages and continues to suffer damages as a result of Defendants wrongful conduct in an amount to be determined by a jury.

**WHEREFORE**, Plaintiff respectfully prays for judgment against the Defendants, who are jointly and severally liable, on all claims and for actual damages and compensatory damages, punitive damages, Expert Fees, as well as any other relief shown to be appropriate including, but not limited to, treble damages, costs and interest, and for such other and further relief as the Court may deem just and proper.

I agree to provide the Clerk's Office with any changes to my address where case related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

This 23 day of June, 2021.

Sohail Abdulla, Pro Se

647 Vincent Ave NE

Aiken, SC 29801